1

2

3

4

5

6

7         UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
8                      AT SEATTLE

9

10   ALASKA AIRLINES INC.,                CASE NO. C11-0616JLR

11                    Plaintiff,          ORDER ON CROSS-MOTIONS
                                          FOR SUMMARY JUDGMENT
12        v.

13   JUDY SCHURKE, et al.,

14                    Defendants.

15               **I.      INTRODUCTION**

16        This dispute arises out of the Washington State Department of Labor and

17   Industry's ("the Department") investigation of complaints filed by flight attendants

18   employed by Plaintiff Alaska Airlines Inc. ("Alaska"), who have alleged that Alaska

19   violated the Washington Family Care Act ("WFCA"), RCW 49.12.265-290.  (*See*

20   *generally* Compl. (Dkt. # 1).)  Defendants Judy Schurke and Elizabeth Smith have been

21   named in their official capacities as the Department's Director and Employment

22   Standards Program Manager, respectively.  (*Id.* ¶¶ 6-7.)

Although Alaska does not dispute its obligation to comply with the WFCA and admits that the statute confers "nonnegotiable" rights on employees (Alaska Mot. (Dkt. # 4) at 7; Resp. to Dep't Mot. (Dkt. # 26) at 11), it maintains that alleged violations of the WFCA should be handled through the mandatory grievance procedures established by the collective bargaining agreement entered into between Alaska and the union that represents its flight attendants (Compl. ¶¶ 12-13). Accordingly, Alaska seeks a declaratory judgment that the Department's enforcement activities against it with respect to the WFCA are preempted by the Railway Labor Act ("the RLA"), 45 U.S.C. § 151, *et seq.* (Count 2), and/or violate the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2 (Count 1). (Compl. ¶¶ 15, 18.) Alaska also seeks a permanent injunction enjoining the Department from taking any action to investigate or enforce WFCA complaints filed by Alaska's flight attendants. (*Id.* at 8.)

Currently before the court are the parties' cross-motions for summary judgment (Dkt. ## 4, 16).[1] Previously, the Department brought a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the court lacked subject matter jurisdiction over the action because Alaska did not present a ripe controversy (Dkt. # 13).

---

[1] Alaska's motion is fashioned as a "motion for injunctive and declaratory relief." (Alaska Mot.) The Ninth Circuit, however, has explained that "a party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment." *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) (quoting *Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995) (emphasis in original). Such a motion is inconsistent with the Federal Rules of Civil Procedure. *Id.* Nevertheless, a court may properly construe a motion for declaratory relief as a motion for summary judgment, and the court does so here. *See id.*

Although the motion was fully briefed by the parties, the Department withdrew it before the court issued a ruling (Dkt. # 44).

The court scheduled oral argument on the cross-motions for summary judgment for January 30, 2012, and further directed the parties to be prepared to address issues of ripeness (Dkt. # 45). Now, having heard the oral argument of counsel and having considered the submissions of the parties, the balance of the record, and the relevant law, the court concludes that Alaska's claims are not ripe for judicial decision. The court, therefore, DISMISSES the complaint and DENIES AS MOOT the parties' cross-motions for summary judgment (Dkt. ## 4, 16). The court GRANTS Alaska leave to file an amended complaint within 30 days of the date of this order.

## II.     BACKGROUND

**A. The Washington Family Care Act**

Under the WFCA, employees who receive paid time off of work for illness, vacation, and personal holiday may use their leave to care for eligible family members. *See* RCW 49.12.265-70. The WFCA provides in part:

> (1) If, under the terms of a collective bargaining agreement or employer policy applicable to an employee, the employee is entitled to sick leave or other paid time off, then an employer shall allow an employee to use any or all of the employee's choice of sick leave or other paid time off to care for:
>
> (a) A child of the employee with a health condition that requires treatment or supervision; or
>
> (b) a spouse, parent, parent-in-law, or grandparent of the employee who has a serious health condition or an emergency condition.
>
> An employee may not take advance leave until it has been earned. The employee taking leave under the circumstances described in this section

must comply with the terms of the collective bargaining agreement or employer policy applicable to the leave, except for any terms relating to the choice of leave.

(2) Use of leave other than sick leave or other paid time off to care for a child, spouse, parent, parent-in-law, or grandparent under the circumstances described in this section shall be governed by the terms of the appropriate collective bargaining agreement or employer policy, as applicable.

RCW 49.12.270.  The WFCA defines "sick leave or other paid time off" as "time allowed under the terms of an appropriate state law, collective bargaining agreement, or employer policy, as applicable, to an employee for illness, vacation, and personal holiday."  RCW 49.12.265(5); *see also* WAC 296-130-020(8).  The Washington Administrative Code defines "health condition that requires treatment or supervision," "serious health condition," and "emergency condition."  WAC 296-130-020(10)-(12).

Within the last ten years, Washington State amended the WFCA to prohibit discrimination against employees who exercise their rights under the statute.  RCW 49.12.287.  The WFCA now provides:

An employer shall not discharge, threaten to discharge, demote, suspend, discipline, or otherwise discriminate against an employee because the employee:  (1) Has exercised, or attempted to exercise, any right provided under RCW 49.12.270 through 49.12.295; or (2) has filed a complaint, testified, or assisted in any proceeding under RCW 49.12.270 through 49.12.295.

RCW 49.12.287.

The Department is charged with enforcing the WFCA.  RCW 49.12.280; *see also* RCW 49.12.041.  It investigates complaints filed under the WFCA and may issue notices of infractions and monetary penalties if it reasonably believes that the employer has failed to comply with the statutory requirements.  RCW 49.12.280; RCW 49.12.285.

## B. The Collective Bargaining Agreement Between Alaska and the Association of Flight Attendants

Alaska is a federally regulated common carrier that employs approximately 9,550 employees, over 2,700 of whom are flight attendants. (Skey Decl. (Dkt. # 6) ¶¶ 5, 8.) The flight attendants' employment is governed by the collective bargaining agreement ("the Alaska CBA") entered into between Alaska and the Association of Flight Attendants ("the AFA"). (*Id.* ¶ 8.)

As required by the RLA, the Alaska CBA establishes a mandatory grievance procedure to provide employees with a venue for resolution of any grievances. (Compl. Ex. B ("Alaska CBA") §§ 19, 20.) When an employee files a grievance, Alaska is obligated to investigate and respond. (*Id.* § 19(A)(2).) Alaska also investigates informal complaints that flight attendants might make to supervisors. (2nd Link Decl. (Dkt. # 24) ¶ 12.)

The Alaska CBA contains language addressing the accrual of, use of, advance scheduling of, and payment for sick leave and vacation. (*Id.* ¶ 6; Alaska CBA § 32.) It provides sick family benefits that track those provided under the WFCA. (1st Link Decl. (Dkt. # 5) ¶ 5.) Additionally, the Alaska CBA sets forth an attendance control program that limits the frequency and amount of accrued sick leave that flight attendants may use for their own illnesses. (1st Link Decl. ¶ 12; Alaska CBA § 32.) Under the attendance control program, flight attendants are assessed points for absences and are disciplined when they accrue too many points. (1st Link Decl. ¶ 11; Alaska CBA § 32(E).) Certain

sick family benefits, however, are exempt from this program.  (1st Link Decl. ¶ 13;

Alaska CBA, Addendum to § 32, question 16.)

Alaska believes that the sick family exemption provides flight attendants with an incentive to abuse the family care benefits.  (1st Link Decl. ¶¶ 12-13.)  The Alaska CBA states that fraudulent use of sick leave is grounds for discharge; therefore, Alaska actively investigates flight attendants who appear to be claiming benefits when they do not have a *bona fide* reason for sick leave pay.  (*Id.* ¶ 15; Alaska CBA § 32(H).)  Indeed, Alaska asserts that some flight attendants have misused these benefits by, for example, claiming sick family leave to care for a family member who does not qualify for such leave under the WFCA, or asserting sick family leave when no leave is available.  (1st Link Decl. ¶¶ 11, 16.)

**C. Alaska's Inflight Department**

Alaska's Inflight Department supervises and oversees Alaska's flight attendants. (1st Link Decl. ¶ 2.)  It handles all human resource-related issues for flight attendants, including but not limited to employee benefits, scheduling, training, and coaching.  (*Id.*) It also administers employee concerns and complaints, which commonly focus on work performance, attendance, and reliability issues.  (*Id.*)  Inflight's staff spends a significant part of their time investigating and responding to flight attendant absences.  (*Id.* ¶ 3.)  For example, because Alaska flight attendants work on "pairings" or "sequences," which may be multi-day assignments including multiple flights, when a flight attendant calls in absent, Inflight must find a replacement who can cover a multiple day sequence or risk flight cancellations.  (*Id.* ¶ 4.)  As a general mater, if a flight attendant calls in absent for

the beginning of his or her pairing or flight sequence in order to care for a sick family

member, he or she will receive sick leave pay for the entire value of the trip.  (*Id.*)

### D.  The Department's Investigation of Complaints by Alaska Flight Attendants

Between February 22, 2010 and July 28, 2010, the Department received 11

complaints from Alaska flight attendants alleging violations of the WFCA by Alaska.

(1st Johnson Decl. (Dkt. # 12) ¶ 7; *see also* 1st Link Decl. ¶ 18.)  Four of these flight

attendants simultaneously filed grievances with Alaska pursuant to the dispute resolution

procedure established by the Alaska CBA.  (1st Link Decl. ¶ 19.)

Nine of the flight attendants alleged that Alaska had paid them for family care

leave but later rescinded the paid leave and assessed attendance points when the flight

attendant failed to comply with Alaska's new family leave verification policy.[2]  (1st

Johnson Decl. ¶ 7.)  Two flight attendants alleged that they were discharged for using

family care leave.  (1st Link Decl. ¶ 18; 1st Johnson Decl. ¶ 11.)

---

[2] Alaska has at times requested that flight attendants who are absent to care for a sick family member submit a verification in the form of an attendance questionnaire.  (1st Link Decl. ¶ 14.)  Along with the questionnaire, Alaska sought to implement a policy in which flight attendants who failed to complete the questionnaire in a certain amount of time following their absence would be assessed half of an attendance point for the absence.  (*Id.*)  The AFA disputed whether the Alaska CBA authorized Alaska to require flight attendants to complete a questionnaire for all absences and/or to assess attendance points for failing to complete the questionnaire, and Alaska and the AFA submitted the issue to arbitration.  (*Id.*)  Alaska agreed not to require flight attendants to complete the questionnaire and to discontinue its assessment of attendance points pending the outcome of the arbitration.  (*Id.*)  In September 2011, the arbitrator issued an opinion in which she found that the Alaska CBA (1) did not prohibit Alaska from requiring all flight attendants to fill out an attendance questionnaire for taking sick leave for themselves or a family member, and (2) did not permit Alaska to assess any attendance points to flight attendants who fail to fill out the attendance questionnaire within a specified time period.  (Arbitrator Opinion (Dkt. # 38-2) at 31-32.)

When Alaska received notices of these complaints from the Department, it was either investigating or had already resolved many of the complaints. (2nd Link Decl. ¶ 12.) Nevertheless, Alaska complied with the Department's requests for responses and documentation. (1st Link Decl. ¶ 18.) As a result, at times Alaska was conducting its own investigations, as well as responding to the complaints filed with the Department. (2nd Link Decl. ¶ 12.)

The Department's investigator did not review the Alaska CBA in conducting these investigations. (1st Johnson Decl. ¶ 9.) The first time the Department received a copy of the Alaska CBA was on August 2, 2010. (*Id.*) Rather, the investigator relied on Alaska's and the employees' representations about whether there was sick leave available at the time the flight attendant alleged that he or she was denied the use of sick leave for family care. (*Id.* ¶ 10.) In the cases involving Alaska's new family leave policy, Alaska admitted that each employee had sufficient sick leave available to cover his or her absence. (*Id.* ¶ 11.) After Alaska reinstated each flight attendant's leave, the flight attendant withdrew his or her complaint with the Department. (*Id.* ¶ 8.) In the cases involving termination, the Department concluded that Alaska terminated the employees for reasons unrelated to the use of family care leave.[3] (*Id.* ¶ 11.) Each of these matters was resolved without a final infraction. (1st Johnson Decl. ¶ 7; 1st Link Decl. ¶ 18.)

Then on or about June 16, 2011, after Alaska had initiated the instant action, another flight attendant filed a WFCA complaint against Alaska. (2nd Mills Decl. (Dkt.

_____

[3] In one instance involving a wrongful termination claim, the Department initially issued an infraction against Alaska but later withdrew it. (1st Johnson Decl. ¶ 12.)

1  # 36) Ex. 1.)  At oral argument, counsel for the Department confirmed that the

2  Department's investigation into this complaint was ongoing and that a decision was not

3  imminent.

4  **E.  Procedural Background**

5       Prior to filing the instant lawsuit, Alaska engaged in extensive discussions with the

6  Department regarding its enforcement activities related to the WFCA and whether the

7  Department has jurisdiction to enforce the WFCA against Alaska.  (1st Humphrey Decl.

8  (Dkt. # 25) ¶¶ 2-11, Exs. A-G.)  In April 2011, Alaska filed its complaint for declaratory

9  judgment and injunctive relief.  (Compl.)  Alaska alleges that the Department cannot

10  resolve claims by flight attendants brought against Alaska under the WFCA without

11  interpreting the Alaska CBA, and that under the RLA, issues involving interpretation of

12  the Alaska CBA must be handled through the internal grievance procedures established

13  by the collective bargaining agreement.  (*Id.* ¶ 13.)  As such, according to Alaska's

14  complaint, the Department fails to comply with the RLA's preemption clause and also

15  violates the Supremacy Clause by interfering with the RLA policy of "prompt and

16  orderly settlement[s]."  (*Id.* ¶¶ 13, 15, 18.)  Alaska further alleges that the Department's

17  enforcement activities have harmed it by undermining the collectively-bargained for

18  grievance and arbitration process and causing undue cost and burden.  (*Id.* ¶¶ 16, 19.)

19  Alaska seeks a declaratory judgment that the WFCA, as applied to Alaska and its flight

20  attendants, is preempted by the RLA and/or the Supremacy Clause, and a permanent

21  injunction enjoining the Department from taking any action to enforce WFCA complaints

22  filed by its flight attendants.  (*Id.* at 8.)

The parties have now filed cross-motions for summary judgment. (Alaska Mot.; Dep't Mot. (Dkt. # 16).) As noted above, the Department also filed a motion to dismiss pursuant to Rule 12(b)(1) based on ripeness (Dkt. # 13). The parties fully briefed the motion to dismiss before the Department withdrew it (Dkt. # 44) prior the January 30, 2012 hearing on the cross-motions for summary judgment. After the Department withdrew the motion to dismiss, the court notified the parties that they should be prepared to address the issue of ripeness at the hearing (Dkt. # 45).[4] The court specifically raised its concerns regarding ripeness at the hearing, and each party was given an opportunity to respond during oral argument.[5]

## III.    ANALYSIS

Pursuant to the Supremacy Clause of the United States Constitution, art. VI, cl. 2, "[a] state law is preempted when (1) Congress has expressly superseded state law, (2) Congress has regulated a field so extensively that a reasonable person would infer that Congress intended to supersede state law, and (3) when there is a conflict between federal and state laws." *Haw. Newspaper Agency v. Bronster*, 103 F.3d 742, 748 (9th Cir. 1996) (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)); *see also Whistler Invs., Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159 (9th Cir.

---

[4] The court may raise the issue of ripeness *sua sponte*. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003); *see also United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003); Fed. R. Civ. P. 12(h)(3).

[5] The notice and opportunity to respond given here complies with the applicable Ninth Circuit standards. *See Scholastic Entm't, Inc. v. Fox Entm't Group, Inc.*, 336 F.3d 982, 985 (9th Cir. 2003).

2008).  Alaska's claims arise under the last category, so called "conflict preemption."[6]

Accordingly, the court's role is "to decide if a state rule conflicts with or otherwise

'stands as an obstacle to the accomplishment and execution of the full purposes and

objectives' of the federal law." *Livadas v. Bradshaw*, 512 U.S. 107, 120 (1994) (quoting

*Brown v. Hotel  & Rest. Emps. & Bartenders Int'l Union Local*, 468 U.S. 491, 501 (1984)

(internal quotation marks and citation omitted)).  Congressional purpose is the "ultimate

touchstone" of the court's inquiry.[7]  *Id.* (quoting *Malone v. White Motor Corp.*, 435 U.S.

497 (1978)); *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 254 (1994).

Although there is a well-developed body of case law addressing conflict

preemption in the context of the RLA, the Ninth Circuit has not yet considered whether

an employer may seek a judicial declaration that the RLA preempts a state agency from

enforcing a state statute against the employer in the absence of a specific claim by an

employee.  Rather, the leading Supreme Court and Ninth Circuit cases on point have

involved individual plaintiffs who brought state-law causes of action against their

employers, *see, e.g.*, *Norris*, 512 U.S. 246; *Lingle v. Norge Div. of Magic Chef, Inc.*, 486

---

[6] There is no dispute that Congress has not expressly preempted the Department's enforcement of the WFCA, and counsel for Alaska acknowledged at oral argument that Alaska had not brought a field preemption claim and that Alaska would have to amend its complaint to bring such a claim.

[7] Although Alaska has alleged two causes of action—violation of the Supremacy Clause and RLA preemption—they are grounded in the same theory, namely that the Department's enforcement of the WFCA conflicts with Congress' purpose in passing the RLA.  (*See* Compl. ¶ 13 (alleging that the Department's enforcement activities are preempted by the RLA and also interfere with RLA policy in violation of the Supremacy Clause).)  The court therefore concludes that the claims are subject to the same analysis, and all future references in this order to Alaska's RLA preemption claim are intended to include its Supremacy Clause claim, as well.

U.S. 399 (1988); *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053 (9th Cir. 2007); *Espinal v. Nw. Airlines*, 90 F.3d 1452 (9th Cir. 1996), and courts have often noted that RLA preemption should be determined on a case-by-case basis, *see, e.g.*, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) ("The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis."); *Adkins v. Mireles*, 526 F.3d 531, 541 (9th Cir. 2008) ("Preemption analysis should take place on a case by case basis.").

Here, however, Alaska's complaint is not based on any particular flight attendant's WFCA complaint, and Alaska seeks a wholesale ruling that the Department's enforcement of the WFCA is preempted in all instances.[8]  In a factually analogous case, the Seventh Circuit held that the employer's RLA preemption claim against the state department of labor was not prudentially ripe.  *Wis. Cent. Ltd. v. Shannon*, 539 F.3d 751 (7th Cir. 2008).[9]  The court here similarly concludes, for the reasons described in detail below, that Alaska's claims are not prudentially ripe.  Consequently, the court does not reach the merits of the parties' cross-motions for summary judgment.

**A.  Ripeness Standards**

The "[r]ipeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"  *Yahoo! Inc. v.*

---

[8] Notably, Alaska has not cited any case in which the court granted an employer the broad relief it seeks here, nor has the court found any.

[9] In its notice to the parties directing them to be prepared to address the ripeness doctrine at oral argument, the court specifically cited *Wisconsin Central* and ordered the parties to be prepared to address it.  (Min. Order (Dkt. # 45) at 1.)

1   *La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1211 (9th Cir. 2006) (en

2   banc) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808

3   (2003) (internal citation omitted)).  For purposes of Article III justiciability, an actual

4   controversy exists within the meaning of the Declaratory Judgment Act when the dispute

5   is "definite and concrete, touching the legal relations of parties having adverse legal

6   interests."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007) (quoting

7   *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41 (1937)).  The

8   dispute must be "real and substantial and admit of specific relief through a decree of a

9   conclusive character, as distinguished from an opinion advising what the law would be

10  upon a hypothetical set of facts."  *Id.* (internal quotation marks omitted).  The basic

11  question in each case is "whether the facts alleged, under all the circumstances, show that

12  there is a substantial controversy, between parties having adverse legal interests, of

13  sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*

14  (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  It is not

15  necessary that there be a threat of imminent litigation for an actual controversy to exist.

16  *Id.* at 132 n. 11.

17      In addition, the court must consider whether a case brought under the Declaratory

18  Judgment Act is prudentially ripe.  "Even where jurisdiction is present in the Article III

19  sense, courts are obliged to dismiss a case when considerations of prudential ripeness are

20  not satisfied."  *Yahoo!*, 433 F.3d at 1211.  "In determining whether a case satisfies

21  prudential requirements for ripeness, [the court] consider[s] two factors: 'the fitness of

22

the issues for judicial decision,' and 'the hardship to the parties of withholding court consideration.'"  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

"Ripeness is a question of law which must be determined by the court." *Herrington v. Sonoma Cnty.*, 834 F.2d 1488, 1494 (9th Cir. 1987).  "[A] court may raise the question of subject matter jurisdiction, *sua sponte*, at any time during the pendency of the action, even on appeal."  *United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003) (citing *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002)); *see also* Fed. R. Civ. P. 12(h)(3).  This is equally true when the case raises concerns of prudential ripeness.  *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). The burden of establishing subject matter jurisdiction and ripeness rests upon the party asserting jurisdiction—here, Alaska.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1164 (9th Cir. 2002); *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

**B. Article III Ripeness**

First, Alaska must carry its burden of establishing Article III ripeness.  Based on the allegations in the complaint and the additional facts submitted to the court through declaration, the court concludes that Alaska has satisfied this burden.  Since the beginning of 2010, Alaska flight attendants have filed 12 complaints with the Department alleging violations of the WFCA, and one complaint remains pending.  The Department has investigated each complaint, and although Alaska has expended resources responding to the Department's investigations, it contends that the RLA preempts the Department from enforcing the WFCA against it.  The Department, on the other hand, maintains that

the RLA does not preempt its enforcement activities *per se* and that it will continue to investigate WFCA complaints filed against Alaska. The dispute over the Department's jurisdiction to enforce the WFCA against Alaska is a definite and concrete dispute. *See MedImmune*, 549 U.S. at 126–27. Alaska has satisfied the court that there is a case or controversy within the meaning of Article III, and thus the court has subject matter jurisdiction over the proceeding.

**C. Fitness of Issues for Judicial Decision**

Alaska must also satisfy the court that the issues are fit for judicial decision. *Abbott Labs.*, 387 U.S. at 149. "Whether a dispute is sufficiently ripe to be fit for judicial decision depends not only on the state of the factual record. It depends also on the substantive legal question to be decided." *Yahoo!*, 433 F.3d at 1212. As the Ninth Circuit has explained, "If the legal question is straightforward, relatively little factual development may be necessary." *Id.* Such questions are more likely to be ripe. *Id.* "By contrast, if the legal question depends on numerous factors for its resolution, extensive factual development may be necessary," which weighs against a finding of prudential ripeness. *Id.*

As an initial matter, the court must define the "precise legal question presented." *Id.* "Depending on the legal question, the case may be ripe or unripe." *Id.* (citing *Adler v. Bd. of Educ.*, 342 U.S. 485 (1952), in which the majority and the dissent framed the legal issue differently and consequently disagreed on the question of ripeness). Here, Alaska seeks a court order prohibiting the Department from investigating WFCA complaints filed by its flight attendants. (*See generally* Compl.) The precise legal

1  question is whether the RLA preempts the Department's enforcement of the WFCA

2  against Alaska.  (*See generally id.*)

3         To determine whether resolution of this question requires a fact-specific inquiry or

4  a pure question of law, the court must begin with the legal standards for RLA

5  preemption.  "Pre-emption of employment standards within the traditional police power

6  of the State should not be lightly inferred."  *Norris*, 512 U.S. at 252 (internal quotation

7  and citation omitted).  As noted above, preemption turns on congressional intent.  *Id.*

8  Congress's purpose in passing the RLA was "to promote stability in labor-management

9  relations by providing a comprehensive framework for resolving labor disputes."  *Id.*

10  "To realize this goal, the RLA establishes a mandatory arbitral mechanism for the prompt

11  and orderly settlement of two classes of disputes"—major and minor.  *Id.* (internal

12  citation and quotation omitted).  Major disputes relate to "the formation of collective

13  bargaining agreements or efforts to secure them."  *Id.* (citation omitted).  Minor disputes

14  involve "controversies over the meaning of an existing collective bargaining agreement

15  in a particular fact situation."  *Id.* at 252-53 (citation omitted).

16         In *Norris*, the Court explained that if a plaintiff's state-law claim is in fact a major

17  or minor dispute, it must be resolved through the mandatory arbitral mechanism

18  established by the RLA, and the plaintiff's claim is preempted.  *Id.*  Such claims are

19  "grounded in the CBA" and involve "the interpretation or application of existing labor

20  agreements."  *Id.* at 256.  By contrast, "a state-law cause of action is not pre-empted by

21  the RLA if it involves rights and obligations that exist independent of the CBA . . . ."  *Id.*

22  at 260; *see also Lueck*, 471 U.S. at 213 (stating the issue as "whether the Wisconsin tort

action for breach of the duty of good faith as applied here confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.").

"To determine whether [a] claim is preempted by the RLA, courts should apply the preemption test used in cases under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185." *Espinal*, 90 F.3d at 1456 (citing *Norris*, 512 U.S. 263). The Ninth Circuit recently articulated a two-part test. First, the court must inquire "into whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA." *Burnside*, 491 F.3d at 1059. "If the right exists solely as a result of the CBA, then the claim is preempted, and [the court's] analysis ends there." *Id.* "[T]o determine whether a particular right inheres in state law or, instead, is grounded in a CBA," the Supreme Court has instructed lower courts "to consider 'the *legal* character of a claim, as 'independent' of rights under the collective-bargaining agreement [and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." *Id.* at 1060 (quoting *Livadas*, 512 U.S. at 123 (citation omitted)) (emphasis and second alteration in *Burnside*).

Second, if "the right exists independently of the CBA, [the court] must still consider whether it is nevertheless substantially dependent on analysis of a collective-bargaining agreement." *Id.* at 1059. "If such dependence exists, then the claim is preempted by [the RLA]; if not, then the claim can proceed under state law." *Id.* at 1059-60. "[T]o determine whether a state right is 'substantially dependent' on the terms of a

CBA, [the court must] decide whether the claim can be resolved by 'looking to' versus interpreting the CBA." *Id.* at 1060 (internal citation omitted). The Ninth Circuit has "stressed that, in the context of [RLA] preemption, the term 'interpret' is defined narrowly—it means something more than 'consider,' 'refer to,' or 'apply.'" *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000). Moreover, "[w]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Lividas*, 512 U.S. at 124 (citing *Lingle*, 486 U.S. at 413 n. 12 (1988)); *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 992 (9th Cir. 2007) ("The parties do not dispute the meaning of these provisions [of the CBA] . . . . There is thus no need to 'interpret' these aspects of the CBAs in assessing whether there were wages 'due' at the time of Soremekun's resignation.").

Applying these principles to the instant dispute, the court finds that it cannot perform the two-part preemption analysis by analyzing only the WFCA and the Alaska CBA, as Alaska asserted at oral argument. With respect to the first part of the analysis, the court must determine "whether the *asserted cause of action* involves a right conferred upon an employee by virtue of state law, not by a CBA." *Burnside*, 491 F.3d at 1059 (emphasis added). The court must also consider "the legal character of a *claim*." *Lividas*, 512 U.S. at 123. The courts, therefore, began their preemption analyses with an individual's complaint, not simply with a statute and a CBA. Here, because Alaska seeks to preempt all causes of action or claims that could arise under the WFCA, the court does

not have an individual complaint before it, and thus it cannot even begin its preemption analysis.

It is equally impossible for the court to analyze the second part of the preemption test—whether a state right is "substantially dependent" on the terms of the applicable CBA—absent a specific employee's complaint. *See Cramer v. Consol. Freightways Inc.*, 255 F.3d 683, 691 (9th Cir. 2001) ("'Substantial dependence' on a CBA is an inexact concept, turning on the specific facts of each case . . . ."). This is particularly true in light of the Supreme Court's statement that "[w]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Lividas*, 512 U.S. at 124; *see also Soremekun*, 509 F.3d at 992.

The court's conclusion that Alaska's claims are not fit for judicial review is buttressed by the case-by-case nature of RLA preemption analysis. As noted above, the Ninth Circuit has stated that "[p]reemption analysis should take place on a case by case basis." *Adkins*, 526 F.3d at 541; *see also Lueck*, 471 U.S. at 220 ("The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis."); *Lingle*, 486 U.S. at 407 n. 7 ("[I]f a law . . . required, *at least in certain instances*, collective-bargaining agreement interpretation, the application of the law *in those instances* would be pre-empted." (emphasis added)); *Cramer*, 255 F.3d at 691; *Milne Emps. Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1410 (9th Cir. 1992) (holding that the plaintiffs' fraud claims were not preempted because interpretation of the CBA was unnecessary in light of the plaintiffs' specific factual allegations, and factually

distinguishing cases where fraud claims were preempted because the facts in those cases required interpretation of a CBA).

The importance of performing a case-by-case preemption analysis with respect to WFCA claims is highlighted by the fact that the statute appears to give rise to more than one type of claim, namely claims related to an employer's failure to allow employees to use leave to care for a family member, as well as claims for discrimination and retaliation related to using leave, attempting to use leave, or filing a WFCA complaint. *See* RCW 49.12.270; RCW 49.12.287. Although one employee's claim may be preempted, another's may not be. Indeed, at oral argument, counsel for Alaska conceded that at least the class of claims alleging retaliation for filing a WFCA complaint could be decided without any dependence on the Alaska CBA. Further, at least one court has found that an employee's claim for wrongful termination based on the WFCA was not preempted. *Esquivel v. Wash. Beef, L.L.C.*, No. CV-05-3041-RHW, 2005 WL 3801462, at *3 (E.D. Wash. Apr. 20, 2005) (denying employer's motion to dismiss employee's wrongful discharge claim based on the WFCA because the employee asserted a nonnegotiable right and the applicable CBA did not need to be interpreted to resolve the claim). These examples make clear that if the court were to grant Alaska the broad relief it requests, the court would risk preempting claims that may be brought properly in state court.

In fact, in a matter analogous to the instant dispute, the case-by-case nature of the RLA preemption analysis led the Seventh Circuit to find that an employer's declaratory judgment action was not prudentially ripe. *Wis. Cent.*, 539 F.3d at 760-61. In *Wisconsin Central*, the plaintiff, an interstate railway company, brought suit against the Illinois

Department of Labor ("IDOL") after the IDOL began investigating complaints filed by the plaintiff's employees that alleged violations of the overtime regulations under the Illinois Minimum Wage Law. *Id.* at 754. The plaintiff sought a declaration that the overtime regulations were preempted by the RLA because enforcing the law would require interpreting provisions in the plaintiff's CBAs. *Id.* at 755.

The overtime regulation at issue stated: "[N]o employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 ½ times the regular rate at which he is employed." *Id.* at 758 n. 3 (quoting 820 Ill. Comp. Stat. 105/4a(1)). The Seventh Circuit noted that "[i]n determining whether this overtime law has been violated, it is necessary to calculate the 'hours worked' . . . as well as the 'regular rate' of pay" and that the CBAs at issue contained "numerous provisions potentially relevant" to making these calculations. *Id.* Indeed, the district court granted summary judgment to the plaintiff because it concluded that the IDOL would be required to interpret the CBA to determine the "hours worked" and the "regular rate of pay." *Id.* at 758.

The Seventh Circuit disagreed with the district court's analysis, finding that the issue was not ripe.[10] *Id.* at 761. The court explained that although preemption is generally a purely legal issue that can be resolved by looking solely at the relevant state

_____

[10] The Seventh Circuit ultimately affirmed the district court's grant of summary judgment in favor of the plaintiff because it found that the Illinois Minimum Wage Law was preempted as applied to interstate railroads under the doctrine of field preemption. *Wis. Cent.*, 539 F.3d at 766. As noted above, *supra* at n. 6, Alaska has not brought a claim based on field preemption.

ORDER- 21

and federal statutes, RLA preemption is different in that it "requires [a] case-by-case factual analysis to determine the extent to which a state law claim will require interpretation of a CBA." *Id.* at 760 (quoting *In re Bentz Metal Prods. Co.*, 253 F.3d 283, 285 (7th Cir. 2001)). The court thus reasoned that the issue of RLA preemption was not fit for judicial decision because the record was not sufficiently developed for the court to engage in the necessary case-by-case factual analysis. *Id.* The court explained further:

> At this stage of the proceedings, all that is clear is that the CBAs will have to be consulted to calculate the "hours worked" and "regular rate" of pay under the Illinois Minimum Wage Act. While this information was sufficient for the district court to determine that computing these values "requires interpretation and application of various provisions contained in the CBAs," the parties have not yet staked out a position for the record as to what these CBA provisions mean, making it impossible to determine at this stage of the proceedings whether a disagreement will exist that will require an arbitrator, under the terms of the RLA, to engage in this CBA interpretation. . . . Here, the IDOL's investigation of [plaintiff's] overtime practices has not yet progressed to a point where it can be determined what dispute, if any, the parties will have over the CBAs' terms. Because preemption under the RLA will only occur if the parties dispute the CBAs' terms . . . the record is not sufficiently developed for this Court to engage in the case-by-case factual analysis required by *In re Bentz Metal Prods. Co.*

*Id.* (internal citation omitted). Accordingly, the court concluded that the case was not fit for judicial decision, as is required to satisfy the first prong of the prudential ripeness inquiry. *Id.*

The facts in *Wisconsin Central* parallel those in the instant matter. Both cases involve employers seeking a court declaration that a state agency is preempted under the RLA from investigating and enforcing the provisions of a state law against it. The statutes in both cases also potentially involve interpretation of a CBA—the Illinois Minimum Wage Law refers to "hours worked" and "regular rate" of pay, the calculation

of which could require interpretation of a CBA; and the WFCA refers to "sick leave or other paid time off," RCW 49.12.270, which is defined as "time allowed under the terms of an appropriate state law, *collective bargaining agreement*, or employer policy, as applicable, to an employee for illness, vacation, and personal holiday," RCW 49.12.265(5) (emphasis added), and could require CBA interpretation. The WFCA also refers to when leave is "earned," RCW 49.12.270, which may require interpretation of a CBA.

Not only are the facts in *Wisconsin Central* analogous to those here, the principles of RLA preemption analysis that were central to the Seventh Circuit's decision—that RLA preemption must be decided on a case-by-case basis, and that no CBA interpretation is necessary where the parties do not dispute the meaning of the relevant provisions—are equally applicable in the Ninth Circuit. As discussed above, the Ninth Circuit has recognized that RLA preemption is determined on a case-by-case basis and turns on the specific facts of each claim. *See, e.g.*, *Cramer*, 255 F.3d at 691; *Milne Employees*, 960 F.2d at 1410. Furthermore, the Ninth Circuit has followed the Supreme Court's guidance in *Lividas*, 512 U.S. at 124, that "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *See Soremekun*, 509 F.3d at 992 (citing *Lividas* in support of its conclusion that there was no need to "interpret" certain provisions in the CBA because the parties did not dispute the meaning of those provisions). The similarities between *Wisconsin Central* and the instant

matter support the court's conclusion that Alaska's claims are not yet fit for judicial decision.

At oral argument, counsel for Alaska sought to distinguish *Wisconsin Central* on the basis that the Illinois Wage and Hour Law is a stand-alone statute, whereas the WFCA is "inextricably intertwined" with the Alaska CBA, such that interpretation of the CBA is inevitable, because the statute specifically references a collective bargaining agreement. The "inextricably intertwined" language derives from the Supreme Court's opinion in *Lueck*, 471 U.S. at 213.

In *Lueck*, the plaintiff brought a state law tort claim against his employer and his disability insurance carrier for the bad-faith handling of his disability claim. *Id.* at 203. The plaintiff was party to a collective bargaining agreement, which incorporated by reference the disability insurance plan. *Id.* at 204. The Court framed the issue before it as whether the "tort action for breach of the duty of good faith *as applied here* confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is *inextricably intertwined* with consideration of the terms of the labor contract." *Id.* at 213 (emphases added). The Court concluded that the plaintiff's claim was preempted, reasoning that "[b]ecause the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation." *Id.* at 218. Ultimately, the Court held that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated

as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Id.* at 221 (internal citation omitted).

The two-part preemption analysis described above was derived from the *Lueck* line of cases. *Burnside*, 491 F.3d at 1059. The "inextricably intertwined" argument Alaska makes is equivalent to the first part of the analysis articulated in *Burnside*— whether a right inheres in state law or is grounded in a CBA. *See id.* As discussed above, however, the Supreme Court and Ninth Circuit have both indicated that the court must consider the "legal character of a *claim*" to answer this question. *Id.* (quoting *Livadas*, 512 U.S. at 123) (emphasis added). Yet Alaska does not base its declaratory judgment action on a particular flight attendant's claim; it seeks to preempt the Department's investigation of all claims. Consequently, the court cannot even begin to analyze the issues presented in this matter. Notably, Alaska has not cited a single case where a court found that a state statute was "inextricably intertwined" with a CBA for purposes of RLA preemption without having an individual employee's complaint before it. The court is not persuaded by Alaska's arguments as to why this matter is fit for judicial determination.

**D. Hardship of Withholding Consideration**

Under prudential ripeness standards, the court must also consider "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. Where "there are substantial uncertainties bearing on the legal analysis to be performed, there is a high threshold requirement for hardship." *Yahoo!*, 433 F.3d at 1218. Indeed, "[t]o meet the hardship requirement, a litigant must show that withholding review would result

in 'direct and immediate' hardship and would entail more than possible financial loss."

*Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1180 (9th Cir. 2010) (quoting

*Winter v. Cal. Med. Review Bd., Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990) (internal

citation omitted)).

In its complaint, Alaska alleges that the Department's enforcement of the WFCA

against it is "problematic" for two primary reasons: (1) some employees who filed

WFCA complaints completely forewent the grievance process established by the Alaska

CBA; and (2) other employees have simultaneously filed grievances and WFCA

complaints, which has caused Alaska to face the costs of litigation in multiple forums, a

loss of efficiency, and the risk of conflicting outcomes. (Compl. ¶ 12.) Although the

Department's enforcement activities have certainly been inconvenient to Alaska and

caused an outlay of financial and staff resources, the court is not persuaded that Alaska

will suffer a direct and immediate hardship that is significant enough to justify the court's

exercise of jurisdiction over this matter at this time, particularly given the court's

conclusion above that the issues are not fit for judicial decision.

## IV.    CONCLUSION

For the foregoing reasons, the court concludes that Alaska has not satisfied its

burden of showing that the instant dispute is prudentially ripe; therefore, the court

DISMISSES the complaint and DENIES AS MOOT the cross-motions for summary

\\

\\

\\

judgment (Dkt. ## 4, 16).  The court GRANTS Alaska leave to file an amended

complaint within 30 days of the date of this order.

Dated this 14th day of February, 2012.


JAMES L. ROBART
United States District Judge